UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.

Case No.      5:08-cr-14-Oc-10GRJ

HENRI ARTILES-MARTIN

_____

### REPORT AND RECOMMENDATION[1]

Pending before the Court is Defendant's Motion To Suppress Illegally Obtained

Evidence And Incorporated Memorandum of Law (Doc. 26) to which he United States

has filed a Memorandum In Opposition. (Doc. 36.) An evidentiary hearing was held

before the undersigned on April 28, 2008 and, therefore, the matter is ripe for

consideration. For the reasons discussed below, Defendant's Motion To Suppress is

due to be **DENIED**.

## I.  Introduction

This case involves a one count indictment against Defendant charging the

Defendant with possession with intent to distribute 5 kilograms or more of cocaine

hydrochloride.  Defendant contends that a traffic stop and vehicle search on January 24,

2008 by the Florida Highway Patrol were in violation of the Fourth Amendment and,

therefore, the cocaine discovered in a false battery compartment in his truck should be

suppressed. Although the Defendant never mentioned the Fifth Amendment in his

---

[1]  Specific, written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

argument at the hearing the Defendant does argue in his motion that his Fifth Amendment rights were violated because of the lengthy examination by the law enforcement officers and thus any statements he made should be suppressed.

Defendant advances two arguments challenging the traffic stop. First, the Defendant contends that the traffic stop was pretextual "and probably related to a hunch ... rather than the claimed observation of a tinted window violation." Secondly, Defendant argues that even if the original stop was legal his continued detention was unconstitutional because there was no basis to establish reasonable suspicion of criminal activity sufficient to prolong the stop.

## II. Evidence And Testimony

Florida Highway Patrol Troopers Jason Lemery and Jimmie Davis, Jr., both experienced law enforcement officers,[2] testified for the Government as the primary witnesses. Defendant testified briefly. The Court also viewed during the hearing the videotape of the traffic stop.[3]

Trooper Lemery and Trooper Davis work together as a drug interdiction team assigned to patrol interstate 75 and the Florida Turnpike in the Sumter County area. Although Troopers Lemery and Davis work in different vehicles they coordinate their movements and work as a team. Additionally, Trooper Davis is assigned to work with "Blek," a canine certified in illegal narcotics detection.

---

[2] The training and educational programs attended by Troopers Lemery and Davis and the number of arrests, quantities of controlled substances seized and value of contraband the troopers have seized are detailed on Government's exhibits. "15" and "14" respectively.

[3] Government Ex. 2.

Trooper Lemery testified that on January 24, 2008 shortly after 2:00 p.m., he was heading north on I-75 after having just finished assisting Trooper Davis in a traffic stop. While he was heading north to the turn-around near the Marion County line, Trooper Lemery observed a blue empty car hauler traveling southbound in the center lane. The empty car hauler caught Trooper Lemery's attention because empty car haulers in his experience normally would not be making any money. As the empty car hauler got closer to Trooper Lemery - and at a vantage point of approximately fifty feet to the west of Trooper Lemery's location - Trooper Lemery observed that the window tint was very dark.  When the empty car hauler passed Trooper Lemery on the southbound side of the highway, Trooper Lemery testified that he was unable to see the driver or the passenger window through the driver's side window because the tint was so dark. Under Florida law, window tint darker than 28 percent on the windows on the driver's or front passenger's windows is illegal. Based upon his observation of the empty car hauler as it passed Trooper Lemery believed that there was a window tint violation. Consequently, Trooper Lemery called Trooper Davis who was still southbound of Trooper Lemery at the location where the troopers had previously conducted a traffic stop, and alerted Trooper Davis that the empty blue car hauler was headed in Trooper Davis' direction.

Trooper Lemery turned around at mile marker 335 and headed southbound at a high rate of speed to catch up to the car hauler. Eventually, Trooper Lemery got close enough to the car hauler near mile marker 332 to observe the car hauler making multiple lane changes from the center lane and outside lane to the inside lane. Trooper Lemery pulled directly behind the car hauler about fifty feet to the rear. After Trooper

3

Lemery pulled beside the car hauler and had a better angle he observed the car hauler to be about two car lengths behind a passenger car directly in front of the car hauler. As Trooper Lemery pulled alongside the car hauler, about midway up the trailer, the car hauler slowed down so that Trooper Lemery was adjacent to the cab of the truck. From this vantage point Trooper Lemery observed the dark tinted window and saw the Defendant roll down the window. Trooper Lemery then slowed down, pulled behind the car hauler and activated his emergency lights. The car hauler then pulled over into the emergency lane on the side of the road near mile marker 330.

Because the car hauler is a commercial vehicle, drivers are required to carry a number of documents including a medical card, license, registration, proof of insurance and a log book showing their duty status and the driver's record hours for the previous seven days. The purpose of the log book is to document compliance with safety standards  by making sure the driver of the commercial vehicle only operates the vehicle for a period not to exceed eleven hours in any twenty-one hour period.

After the car hauler pulled over, Trooper Lemery approached the vehicle from the passenger window and stood on the step on the passenger side as he questioned Mr. Artiles. The videotape of the traffic stop - which was recorded from the front of Trooper Lemery's patrol vehicle - begins around 2:12 p.m. According to Trooper Lemery, at about 2:13 p.m. he observed that Mr. Artiles eyes were blood shot, which suggested to Trooper Lemery either something medical, intoxication or that Mr. Artiles was tired. During the conversation, Trooper Lemery requested documentation from Mr. Artiles, including the log book. Trooper Lemery testified that he requested the log book to make sure that Mr. Artiles was complying with the guidelines of the Department of

4

Transportation. In addition, Trooper Lemery asked Mr. Artiles questions about his trip so that he could compare the answers to the information in the log book and the other documentation. After less than eight minutes had passed, Trooper Lemery instructed Mr. Artiles to exit the truck and retrieve the documentation so that Trooper Lemery could inspect the documents. As depicted on the video of the traffic stop, Trooper Lemery and Mr. Artiles stood near the front hood of Trooper Lemery's vehicle. Trooper Lemery inspected the log book[4]  to insure that the entries were accurate. During the questioning, Trooper Lemery asked Mr. Artiles his destination and was told that Mr. Artiles was headed to Orlando and then Daytona Beach. When Trooper Lemery inspected the log book he noted that Mr. Artiles had recorded a different location - West Palm Beach, Florida - as his destination.

During the questioning Trooper Lemery also discovered an additional material inconsistency between the locations where Mr. Artiles actually had been and the entries in the log book. The log book discloses that from 9:00 p.m. on January 22, 2008 until 11:00 a.m. on January 23, 2008 Mr. Artiles was stopped near Houston in an area known as Baytown. However, a traffic ticket that was in the log book, and shown to Trooper Lemery, discloses that Mr. Artiles received a traffic citation[5] for excessive window tint at 8:53 a.m. on January 23, 2008 in Kleberg County, Texas, a distance of approximately two hundred fifty miles from Baytown as documented in the log book. The traffic ticket was shown to Trooper Lemery around 2:20 p.m. After Trooper Lemery found out that

[4]  Government Ex. 3.

[5]  Government Ex. 4.

5

Kleberg County, Texas is hundreds of miles from Baytown, Trooper Lemery confronted Mr. Artiles about the inconsistency between the entry in the log book and the traffic citation. At approximately 2:26 Mr. Artiles admitted to Trooper Lemery that the log book was not correct and that indeed Mr. Artiles had "fixed it." When a log book has been falsified a federal law enforcement officer has the authority to prohibit a truck driver from continuing to drive.

Trooper Lemery also identified another material inconsistency in the documentation. The traffic citation disclosed that Mr. Artiles' destination was Montgomery, Alabama and not West Palm Beach, as disclosed in the log book - nor Daytona or Orlando as Mr. Artiles previously had told Trooper Lemery. Trooper Lemery questioned Mr. Artiles about the inconsistencies between the destinations on the traffic citation, the destination in the log book and the destination Mr. Artiles provided to Trooper Lemery. Mr. Artiles' response was that he told the trooper in Texas, who issued the citation, that he was going to sleep in Montgomery, Alabama.  Trooper Lemery recognized that Montgomery, Alabama is not located along I-10 and is several hours north of the I-10 corridor.

While Trooper Lemery was conducting the traffic stop, Trooper Davis arrived on the scene. While the videotape does not disclose the exact time Trooper Davis arrived - because he parked behind Trooper Lemery's vehicle out of camera range - the evidence established that Trooper Davis arrived sometime before Trooper Lemery completed his questions concerning the Texas traffic citation. The evidence supports this conclusion because Trooper Lemery testified that he asked Trooper Davis to look up the location of Kleborg County while Trooper Davis was parked behind Trooper

6

Lemery's patrol vehicle. Trooper Lemery received this information concerning the location of Kleberg County, Texas from Trooper Davis before Trooper Lemery completed the questioning of the Defendant about the traffic citation and before the Defendant admitted he had falsified the log book. Thus, the evidence establishes that Trooper Davis arrived on the scene no more than eight minutes and possibly less after the time the traffic stop was initiated.

Shortly thereafter, at about two thirty-five p.m., the videotape evidences that Trooper Davis asked Mr. Artiles if Trooper Davis could shut off the engine on the truck. The reason Trooper Davis wanted the engine shut off was for the safety of the canine and is a routine practice when Trooper Davis is going to walk the dog. Trooper Davis then proceeded to walk "Blek," the drug detection canine, around Mr. Artiles' truck. After a very short period of time - at approximately 2:38-39 p.m. - the drug detection canine alerted on the battery compartment located underneath the step on the driver's side of the cab of the truck. Thus, the elapsed time between when Trooper Lemery began to question Mr. Artiles at 2:13 p.m. and the time "Blek" alerted on the truck at 2:38 p.m. was no more than twenty-five minutes.

After the dog alerted on the truck, the troopers then began their search and removed the covering to the battery compartment and inspected the four batteries.[6] Through utilization of a density measuring device the troopers learned that the two batteries in the middle had a different density from the outside batteries. The troopers lifted the corners of the batteries which confirmed that the two outer batteries had a

---

[6] *See,* Government Ex. 9 for a depiction of the four batteries in the battery compartment.

different weight from the inside batteries. When the troopers opened the two inside batteries they found twelve bags of cocaine weighing a total of approximately 25.5 pounds. The Defendant was then placed under arrest.

The Defendant elected to testify and provided specific and limited testimony. The Defendant testified that before he was stopped by Trooper Lemery he had pulled into the southbound exit on I-75 at exit 337 near the weigh station.. According to Mr. Artiles, both of his windows were rolled down when he exited I-75. Mr. Artiles testified that when he first saw Trooper Lemery, Trooper Lemery was in the front of his truck and Mr. Artiles was not looking through his window.

### III.  ANALYSIS

The Defendant raises two issues in support of his motion for suppression. First, the Defendant challenges the reasons for the initial stop as pretextual and suggests that the troopers' version of the reason for the traffic stop is not believable. Second, Defendant argues that beyond the brief time that was necessary to conduct the traffic stop, the continued detention of Defendant was unconstitutional because there was no reasonable suspicion of criminal activity.

### A.    The Traffic Stop

Turning first to Defendant's challenge to the stop based upon pretext, that argument is foreclosed by *Whren v. United States.*[7] In *Whren* the Supreme Court held that an officer's subjective motives in making a traffic stop are irrelevant to whether the

---

[7] 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

stop is "objectively justifiable" under the Fourth Amendment.[8] Accordingly, post *Whren* the only inquiry utilized in the Eleventh Circuit when analyzing the constitutionality of a traffic stop under the Fourth Amendment is whether the police have reasonable cause to believe that a traffic violation occurred.[9] The pretext or the officer's motives in making the stop are no longer relevant.

A traffic stop is a constitutional detention if it is justified by reasonable suspicion under *Terry v. Ohio*[10] or probable cause to believe a traffic violation has occurred under *Whren.*[11] Thus, in order to determine whether or not a specific Fourth Amendment requirement such as probable cause or reasonable suspicion has been met, the Court must determine whether the officer's actions were reasonable.[12] "Reasonable, articulable suspicion of criminal activity means that the Government must point to specific and articulable facts, together with rational inferences drawn from those facts, that reasonably suggest criminal activity has occurred."[13]

The Government contends that there were at least two traffic law violations. The first traffic violation occurred  when Trooper Lemery observed that the windows on

---

[8] *Id.* at 810, 116 S.Ct. 1769

[9] *See,* United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999); United States v. Holloman, 113 F.3d 192, 194 (11th Cir. 1997).

[10] 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

[11] United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003).

[12] *Id.* In Chanthasouxat the Eleventh Circuit cited United States v. Lopez-Soto, 205 F.3d 1101, 1104-05 (9th Cir. 2000) in noting that several circuits have held that the Supreme Court's statement in Whren that probable cause justifies a traffic stop did not change the Court's previous holding in Terry that "reasonable suspicion is all the Fourth Amendment requires for a traffic stop. 342 F.3d at 1275 n. 2.

[13] Terry, 392 U.S. at 21.

Defendant's car hauler were tinted darker than the law permits. There is no question that a traffic stop is lawful where the stop is made because the window tinting on the vehicle is too dark under Florida law.[14]  Consequently, if there was reasonable suspicion to support the traffic stop the Defendant's argument would fail.

The evidence presented at the hearing established that there was more than reasonable suspicion that the windows on the car hauler were tinted too dark. The Defendant does not challenge - and indeed concedes - that the tint on the windows was not in compliance with Florida law.[15] The windows were ultimately inspected by the troopers using a "Tint Meter Enforcer," which evidenced that the tint on the window only allowed 17 percent of the visible light range.[16] Moreover, the Defendant previously had received a citation from a Texas law enforcement officer for violating the Texas tint requirements.

Because the Defendant cannot refute that his windows were heavily tinted he instead  raises two challenges to the credibility of Trooper Lemery's testimony that Lemery observed the windows were tinted too darkly. First, Defendant challenges the veracity of Trooper Lemery testimony by suggesting that the Trooper could not have seen the tint of a vehicle traveling in the opposite direction at a high rate of speed. Secondly, Defendant challenges the veracity of Trooper Lemery's testimony by

---

[14] United States v. Weaver, 145 Fed. Appx. 639 (11th Cir. 2005); Vasquez v. United States, 2007 WL 2936263, at *4 (M.D.Fla. Oct. 9, 2007)("The Trooper stopped Petitioner under the reasonable and correct belief that Petitioner was in violation of Florida's window tinting law, and a motion to suppress on this basis would have failed."); United States v. Moore, 2006 WL 1232811, at *2 (M.D.Fla. May 5, 2006).

[15] Florida Statute § 316.2953 requires that the side window tinting must allow light transmittance at no less that 28 percent of the visible light range.

[16] Government Ex. 17.

suggesting that his windows were rolled down at the time. The Court is not persuaded by either argument.

With regard to the ability of Trooper Lemery to observe the tint, Trooper Lemery testified in great detail that he was not able to see through the driver side window to observe the driver or even see through the driver's window to observe the passenger window as Defendant's truck passed him at a distance of about 50 feet. Trooper Lemery is a highly trained Florida Highway Patrol officer with significant experience in spotting traffic violations including window tint violations. The Court, therefore, was not offered any reason to doubt the veracity of Trooper Lemery's observations. Moreover, Trooper Lemery also confirmed with Trooper Davis that the windows were heavily tinted when Defendant's vehicle passed Trooper Davis, who was located south of the location where Trooper Lemery observed Defendant's truck. The Court also has the benefit of a photograph of the truck,[17] which clearly depicts windows tinted so heavily that they almost appear to be black.

Lastly, even if the troopers could not have observed the heavy window tint as the vehicle was passing, Trooper Lemery eventually caught up with the Defendant's vehicle heading southbound several miles from the turn around. Once Trooper Lemery caught up with Defendant's vehicle he could observe the heavy tint on the windows. At this point there is little question that Trooper Lemery had reasonable suspicion that there was a tint violation regarding the windows on Defendant's truck.

The only evidence that Defendant offered to challenge this testimony was the

---

[17] Government Exhibit 8.

Defendant's own testimony suggesting that Trooper Lemery could not have seen the window tint because the Defendant had rolled down the windows. Curiously, however, during the Defendant's testimony he never offered the simple, direct and straight forward statement that his windows were rolled down during the relevant period of time. Rather, the Defendant merely testified that he had pulled into the southbound exit at 337 and that when he exited both windows were down. Notably, no mention was made as to whether the windows remained in the down position when the Defendant got back on I-75.  Defendant then skipped over the issue of whether his windows were up or down when Trooper Lemery caught up with him and instead testified that when he saw Trooper Lemery he was not looking through his window because Trooper Lemery was in front of his truck. This cryptic testimony offered by Defendant fails to rebut Trooper Lemery's direct and straight forward testimony that Lemery readily observed the heavy window tint on the vehicle as it passed him and readily observed the heavy window tint when he caught up to Defendant's vehicle.

For these reasons, the Court does not find Defendant's version believable - and certainly to the extent there is a conflict between the two versions - the Court readily concludes that the troopers' version is more trustworthy. Indeed, there is not really a conflict between the two versions because Defendant's version is not even supported by his own direct sworn testimony, which never included the statement that the windows on his truck were completely rolled down and not visible when Trooper Lemery pulled him over.

There was another reason offered by the Government to support the traffic stop. Trooper Lemery also testified that when he eventually caught sight of Defendant's

12

vehicle heading southbound the truck changed lanes multiple times and that when

Trooper Lemery pulled alongside of Defendant's truck, the Defendant was in the outside

lane only about two car lengths behind a passenger car. The decision to initiate a traffic

stop for following only two car lengths behind a vehicle traveling on an interstate at the

posted speed limit of 70 miles per hour is not unreasonable and may constitute a

violation of Florida's traffic laws.[18] Where, as here, an officer observes a driver following

too closely to another vehicle in violation of state law, the officer has sufficient probable

cause to make a traffic stop.[19] The Defendant did not offer any evidence or argument

challenging the fact that he was traveling too closely to the passenger vehicle in front of

him when he was stopped by Trooper Lemery.                    Accordingly, independent

of whether there was probable cause to support the traffic stop for the window tint

violation, there was probable cause to conduct a traffic stop for this traffic violation. For

these reasons the Court concludes that the traffic stop of the Defendant's truck was

supported by articulable facts, which reasonably led Trooper Lemery to make the traffic

stop and, thus, the traffic stop was lawful under the Fourth Amendment.

**B.     The Duration And Scope of The Traffic Stop**

The Defendant argues that the duration and scope of the traffic stop exceeded

constitutional limits for a routine traffic stop. According to Defendant, the troopers were

---

[18] Fla. Stat. § 316.0895(1) provides in relevant part: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent , having due regard for the speed of such vehicles and the traffic upon, and the condition of, the highway."

[19] United States v. Purcell, 236 F.3d 1274, 1276 (11th Cir. 2001)(following less than three car lengths held to be following too closely under Fla. Stat. 316.0895 and thus there was probable cause for the traffic stop.); United States v. Perez, 200 F.3d 576, 579 (8th Cir. 2000)(Finding trooper had "probable cause to stop [the defendant] for following too closely behind the preceding vehicle, in violation of Nebraska law.").

not conducting a traffic stop but instead were engaged in a criminal investigation without any reasonable suspicion that the Defendant was involved in criminal activity. The Defendant also suggests that the illegal detention was unreasonably prolonged until Trooper Davis and the drug detection canine could conduct the dog sniff of the outside of the truck.

With regard to the scope of the traffic stop the Defendant focuses his argument on the type of questioning by Trooper Lemery. Defendant contends that the majority of the questions by Trooper Lemery had nothing to do with the traffic stop itself. Defendant underscores the fact that early-on during the stop Trooper Lemery did not pose any questions concerning the heavily tinted windows but rather posed questions concerning the Defendant's itinerary, the purpose of his trip and his trucking business. Defendant also points to further questioning by Trooper Lemery concerning the reasons Defendant had a Miami company, the discrepancy between the fact that his mother had a Tampa address and the Defendant lived in Texas - plus questions about the fact that Mr. Artiles was spending a lot of money for fuel while not carrying any vehicles. Defendant contends that because these questions had nothing to do with the traffic violation they were outside of the scope of the investigation and thus unconstitutional.

The determination of whether the scope of an investigatory stop is permissible focuses upon something more than simply the types of questions that are asked. That is so because questioning, of itself, constitutes neither a search nor a seizure.[20] Indeed, the Eleventh Circuit has not yet adopted any particular guideline or test to determine

---

[20] United States v. Purcell, 236 F.3d 1274, 1279 (11th Cir. 2001)(quoting United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993)).

14

when the scope of an investigatory stop has been exceeded. In *United States v.*
*Boyce*[21] - favorably cited by Defendant - the Eleventh Circuit recognized two divergent
lines of cases for determining the permissible scope of an investigatory traffic stop. One
test from the Tenth Circuit "limits the questions a police officer may ask to those
questions that are justified by reasonable suspicion of criminal activity or reasonable
safety concerns."[22] The other test from the Fifth Circuit "holds that questions unrelated
to the reason for the initial stop are only unlawful if they extend the duration of the initial
seizure."[23]  However, under either test, the conduct of the traffic stop and the
questioning by Trooper Lemery did not exceed the permissible scope of the
investigatory stop.

When Trooper Lemery approached the Defendant's vehicle and began
questioning the Defendant, it was perfectly appropriate to request the Defendant to
produce his driver's license, registration, insurance - and because this vehicle was a
commercial truck - the driver's medical card and the driver's log book.[24] In addition, as
part of an officer's reasonable investigation during a traffic stop an officer may ask
questions regarding the driver's destination and purpose.[25] Notably, in this particular

---

[21] 351 F.3d 1102, 1111 (11th Cir. 2003).

[22] *Id.*

[23] *Id.*

[24] United States v Maldonado, 356 F.3d 130, 134 (1st Cir. 2004)(in the case of a commercial
vehicle it is not unreasonable for state trooper to request defendant to produce medical certificate and log
book).

[25] United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995).

case questions concerning the driver's destination, itinerary and purpose of the trip were not only permissible but were necessary to investigate whether the log book was accurate. At the inception of the stop the first thing that Trooper Lemery noticed was that the Defendant's eyes were extremely bloodshot - a condition that Trooper Lemery believed could evidence intoxication or simply fatigue. Whether the Defendant was fatigued from driving beyond authorized time limits would be evidenced in the log book. The log book is the record all commercial drivers must keep to document that they have not driven more than eleven hours in any twenty-one hour period. Although the log books are kept by commercial drivers under an informal honor system, the falsification of a log book is a violation of 49 C.F.R. § 395.8. Where a law enforcement officer determines that a commercial driver has falsified the log book and driven more than the authorized period of time, the officer has the authority to prohibit the driver from operating the vehicle for eight hours.[26] Thus, the questioning by Trooper Lemery concerning Mr. Artiles's destination was not only routine but necessary to determine whether he had driven beyond the authorized time for a commercial truck driver

The Defendant's responses to Trooper Lemery's initial questions concerning his destination reasonably raised suspicion - at least with regard to whether the log book had been falsified. The Defendant told Trooper Lemery that his destination was Orlando and Daytona Beach, while the log book showed his destination as West Palm Beach, Florida.

As Trooper Lemery further examined the log book more inconsistencies were

---

[26] 49 C.F.R. § 395.13.

uncovered between the Defendant's responses and the information in the log book, which further raised a reasonable suspicion that the entries in the log book might have been falsified and that the Defendant may have been driving the vehicle outside of the time limits permitted by the Department of Transportation. When Trooper Lemery advised the Defendant that his window tint was too dark (which was only about eight minutes into the stop) the Defendant admitted that his windows were tinted too heavily and that he had received a ticket in Texas, a copy of which was in the log book. Trooper Lemery asked to see the ticket and upon examination discovered that the ticket had been given to the Defendant in Kleborg County, Texas on the same day and time when Defendant represented in his log book that he was in Baytown, Texas, two hundred fifty miles away. The ticket also disclosed Defendant's destination as Montgomery, Alabama, a  representation which was inconsistent with what the Defendant told Trooper Lemery and a representation inconsistent with the destination in the log book itself. The Defendant attempted to explain the inconsistency on the ticket by telling Trooper Lemery that the Defendant had told the officer who issued the Texas citation that he was going to stop in Montgomery to sleep. Montgomery, Alabama is, of course, approximately 165 miles north of I-10, which is a two hour drive that a truck driver is not likely to make simply to pull over for the night to sleep.

The Defendant ultimately admitted that he had falsified the log book when he told Trooper Lemery "I fixed it [the log book] in Houston" and he conceded "you got me." However, the Defendant did not make the admission that the log book had been falsified until approximately 2:26 p.m., which was more than fourteen minutes into the traffic stop. By this period of time Trooper Davis already had arrived on the scene. Less

17

than ten minutes after the Defendant admitted that he had falsified the log book Trooper Davis had initiated the dog sniff.

Thus, after Trooper Lemery noticed the Defendant's blood shot eyes he had reasonable suspicion that the Defendant may have been operating the vehicle for too long a period of time. Once an officer develops reasonable suspicion he has a duty to investigate more.[27] Trooper Lemery was, therefore, justified in pursuing questioning the Defendant about his trip. As the Defendant continued to provide Trooper Lemery with answers that were inconsistent with the information in the log book, Trooper Lemery's reasonable suspicion continued to justify questioning the Defendant about his trip and the entries in the log book.

Where, as here, the answers to the investigative questions by a law enforcement officer lead to further questioning the officer is justified in continuing the detention of the driver of a traffic stop.[28]  Once, the Defendant admitted that the log book had been falsified, Trooper Lemery had the authority to prevent the Defendant from driving the truck. It was not necessary for Trooper Lemery to do so, however, because in the meantime Trooper Davis asked for permission to turn off the engine to the truck and then initiated the dog sniff. Where an officer arrives at the scene while a traffic stop is in progress and uses a narcotics-detection dog to sniff around the exterior of a motorist's vehicle there does not need to be a reasonable, articulable suspicion to initiate the dog

---

[27] United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991)("Where ... the initial stop was legal, the [officer] had the duty to investigate suspicious circumstances that then come to his attention.").

[28] United States v. Hernandez, 418 F.3d 1206, 1211 (11th Cir. 2005)("[a]s each answer of the Trooper's investigative questions failed to allay his concerns, the Trooper's reasonable suspicion was bolstered, thus justifying his continuing to detain the Defendant, his call for the dog and his request to search the truck.")

sniff because there is no implication of legitimate privacy interests under the Fourth Amendment.[29] Once "Blek" alerted on the Defendant's truck the traffic investigation was over and there was sufficient probable cause to search the vehicle for controlled substances.[30]

For these reasons, the Court concludes that the questions asked by Trooper Lemery were reasonably related to a traffic stop of a commercial vehicle (traveling without any cargo) and were further justified by reasonable suspicion that the Defendant's log book may have been falsified.  Accordingly, the scope of the traffic stop did not exceed permissible limits for an investigatory traffic stop.

Turning to the duration of the stop, the Court concludes that the questioning during the traffic stop did not impermissibly extend the traffic stop beyond constitutional limits. A traffic stop must be of limited duration and may not last "any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity."[31] As discussed above, from the period of time that Trooper Lemery stood on the passenger step of Defendant's truck and first observed the Defendant he noted that the Defendant had extremely blood shot eyes. This fact created reasonable suspicion to investigate the Defendant's trip itinerary and make inquiry into the Defendant's inconsistent answers and the entries in the log book.

In considering whether the duration of a stop is constitutional, courts examine the

---

[29] Illinois v. Caballes, 543 U.S. 405, 409 (2005).

[30] United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998)("Once a trained canine gives a positive alert to a vehicle, probable cause exists to make the search of that vehicle.").

[31] United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001).

time that elapsed between the initial stop and the time the officer obtained consent or other justification for the search - which in this case was the positive dog alert.[32] The time elapsed between the initial stop and the positive dog alert was a relatively short period of time of only about twenty-five minutes.[33] "[T]he police are not constitutionally required to move at top speed or as fast as possible."[34]  While there is no bright line standard for the permissible time period for an investigatory traffic stop - and recognizing that the duration of a traffic stop is dependent upon the nature of the stop and whether there is reasonable suspicion to extend the stop -  twenty-five minutes between the stop and the discovery of probable cause to conduct a search, is well within the range of time periods that the Eleventh Circuit has found to be constitutionally permissible.[35]

Lastly, while the Defendant suggests in his papers that the traffic stop was unreasonably extended so that Trooper Davis could arrive on the scene with "Blek," there was no evidence to support this argument. To the contrary, Trooper Davis arrived

---

[32] Hernandez at 1210 ("Therefore, it is only the intermediate period of seventeen minutes of detention leading up to the consent to search that we must evaluate for constitutional reasonableness."); Purcell at 1279 (considering only portion of stop before lawful consent to search as relevant inquiry of whether duration was unconstitutional.)

[33] The initial contact was made with the Defendant at about 2:13 p.m., the dog sniff began at about 2:35 and the dog alerted on the truck shortly thereafter at about 2:38 p.m.

[34] Hernandez at 1212 n. 7.

[35] See, e.g. Purcell at 1278 (fourteen minutes not unreasonable on its face); Hernandez at 1212 n. 7 ("Where at its inception a traffic stop is a valid one for a violation of the law, we doubt that a resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short."); United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988)(holding that an investigative stop of 50-minute duration is not unreasonable); United States v. Monzon-Gomez, 244 Fed.Appx. 954, 960 (11th Cir. 2007)("the thirty minutes it took to confirm the deputies' suspicion was not unreasonably long.").

at the scene of the traffic stop several minutes *before* the Defendant admitted that he had falsified the log book. The Defendant finally admitted that he had falsified the log book at 2:26 p.m. and thus the traffic stop had only lasted at that point fourteen minutes - a time period that is more than reasonable for almost any routine traffic stop.

At that point because the Defendant admitted that the log book was falsified he was not then at liberty to drive the truck and thus the additional ten minutes before the dog sniff was initiated is inconsequential. There is simply no evidence that Trooper Lemery contacted Trooper Davis after the traffic stop was completed and then extended the detention of the Defendant to allow sufficient time for Trooper Davis to arrive with the narcotics detection canine. Rather, Trooper Davis arrived on the scene during the time period that the investigatory stop was on-going and before the investigation had been completed. Accordingly, there is no evidence to support Defendant's argument that the traffic stop was unreasonably extended so that Trooper Davis and "Blek" could conduct a dog sniff on Defendant's truck.

For these reasons, the Court concludes that the duration of the investigatory stop was not impermissibly extended and thus did not violate the Defendant's Fourth Amendment rights.

**C.    The Fifth Amendment Claim**

Defendant also claims that his rights under the Fifth Amendment were violated because he was not provided *Miranda* warnings even though the stop was only a *Terry*

stop.[36] Relying upon *United States v. Perdue*[37] Defendant argues that even though the

stop was a *Terry* stop where the stop and detention is a "highly intrusive, 'non-arrest'

encounter" the detention is sufficiently custodial to implicate the Fifth Amendment and

require *Miranda* warnings. There is currently a split in the circuits over whether coercive

*Terry* stops constitute *Miranda* custody.[38]  While the Eleventh Circuit has not expressly

adopted either view, the Circuit addressed this issue in *United States v. Acosta*.[39]

In *Acosta* the Court distinguished *Perdue* and focused upon the nature and level

of restraint that the defendant was subjected to during the *Terry* stop. In *Perdue*, the

suspect there, along with his pregnant fiancèe, were stopped in an isolated, rural area

not subject to public scrutiny, forced to the ground and questioned by police while the

officers kept their guns drawn, all the while helicopters circled overhead. There was also

a suggestion that physical force and handcuffs may have been used. The *Perdue* court

concluded that these circumstances would lead a reasonable person in the detainee's

---

[36] Although the Defendant never raised this argument at the suppression hearing he did brief the issue in his Motion to Suppress so the Court will address the issue.

[37] 8 F.3d 1455, 1466 (10th Cir. 1993).

[38] The First, Fourth, and Eighth Circuits hold that so-called *Terry* reasonableness means *Miranda* warnings are not required, even if the stop was coercive. *See,* United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003)(finding that a suspect is not in custody when an investigative stop is reasonable); United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001)(same); United States v. Leshuk, 65 F.3d 1105, 1110 (4th Cir. 1995)(same). The Second, Seventh, Ninth and Tenth circuits hold that a coercive *Terry* stop requires warnings but still is deemed a valid *Terry* stop. *See,* United States v. Newton, 369 F.3d 659, 673 (2d Cir. 2004)("This Court has specifically rejected Fourth Amendment reasonableness as the standard for resolving *Miranda* custody challenges."); United States v. Kim, 292 F.3d 969, 976 (9th Cir. 2002); United States v. Ali, 68 F.3d 1468, 1472-73 (2d Cir. 1995)(holding that whether a stop was permissible under *Terry* is irrelevant to the *Miranda* question, because "*Terry* is an exception to the Fourth Amendment probable cause requirement, not to the Fifth Amendment protections against self-incrimination."); United States v. Smith, 3 F.3d 1088, 1097 (7th Cir. 1993); United States v. Perdue, 8 F.3d 1455.

[39] 363 F.3d 1141, 1148-1150 (11th Cir. 2004).

position to feel he was completely at the mercy of the police. Consequently, the *Perdue* court concluded that the stop was the kind of "highly intrusive, 'non-arrest' encounter" in which *Miranda* warnings may be required.

In contrast the suspect in *Acosta*, was stopped in a parking lot visible to public scrutiny and was questioned while he was standing without any show of physical force or use of handcuffs. The restraint Acosta was subjected to during the *Terry* stop was "the minimal amount necessary for such a stop or close to it" and the "stop did not involve the type of 'highly intrusive' coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made."[40] The Eleventh Circuit, therefore, held that no *Miranda* warnings were required because  "a reasonable person in Acosta's position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess, or else."[41]

Like the suspect in *Acosta*, Mr. Artiles was not subjected to any highly intrusive or coercive actions by the Troopers during the traffic stop. Indeed, the videotape of the traffic stop in this case depicts a very routine and non-coercive encounter between Trooper Lemery and Mr. Artiles. During the entire time the traffic stop was being conducted Mr. Artiles was either sitting in his truck or standing in the front of Trooper Lemery's patrol vehicle in broad daylight as literally hundreds of vehicles on I-75 sped past the scene of the stop. There were no threats, no handcuffs, no guns or anything else utilized that could be considered coercive or intrusive. Simply stated, a reasonable

---

[40] *Id.* at 1150.

[41] *Id.*

person in Mr. Artiles' position would not have believed that he was "utterly at the mercy of the law enforcement, away from the protection of public scrutiny." Therefore, even assuming that the law may require *Miranda* warnings in a coercive *Terry* stop, the traffic stop in this case does not even come close to falling within the universe of *Terry* stops, which may be characterized as "highly intrusive, 'non-arrest' encounter[s]." Accordingly, there was no violation of Defendant's Fifth Amendment rights because he was not given *Miranda* warnings during the *Terry* stop.

## IV.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that  Defendant's Motion To Suppress Illegally Obtained Evidence (Doc. 26) should be **DENIED**.

**IN CHAMBERS** at Ocala, Florida this 17th day of May, 2008.

GARY R. JONES
United States Magistrate Judge

Copies to:

Honorable Wm. Terrell Hodges
Senior United States District Judge

United States Attorney (Armstrong)
Counsel for Defendant